IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Dana A.,[1] | ) | C/A No.: 1:20-2012-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Andrew M. Saul, | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable David C. Norton, United States District Judge, dated July 28, 2020, referring this matter for disposition. [ECF No. 12]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 11].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the claim for Supplemental Security Income ("SSI"). The two issues before the court are

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

I.     Relevant Background

A.     Procedural History

On December 20, 2016, Plaintiff filed an application for SSI.[2] Tr. at 14. Her application was denied initially and upon reconsideration. Tr. at 194–97, 206–09. On April 25, 2019, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Evangeline Mariano-Jackson. Tr. at 33–52 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 31, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 9–30. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial

---

[2] Plaintiff filed prior claims for Disability Insurance Benefits ("DIB") and SSI on March 23, 2015, that were denied at the initial level on June 24, 2015. Tr. at 189–93. During the hearing, Plaintiff's attorney made an oral motion to reopen the 2015 claims. Tr. at 37. The ALJ stated she would rule on the motion after the hearing. Tr. at 37–38. However, the record does not reflect that she addressed the motion at the end of the hearing or in her written decision. *See generally* Tr. at 9–30, 33–52. Plaintiff was insured for DIB through December 31, 2015. Tr. at 129. Because the ALJ did not rule on Plaintiff's motion, she should address it on remand.

2

review of the Commissioner's decision in a complaint filed on May 27, 2020. [ECF No. 1].

### B.    Plaintiff's Background and Medical History

#### 1.    Background

Plaintiff was 42 years old at the time of the hearing. Tr. at 39. She completed high school. *Id.* Her past relevant work ("PRW") was as a retail manager, a bookkeeper, a financial manager, and an administrative clerk. Tr. at 49, 495. She alleges she has been unable to work since April 12, 2014.[3] Tr. at 129.

#### 2.    Medical History

On May 25, 2010, magnetic resonance imaging ("MRI") of Plaintiff's cervical spine showed a broad-based disc bulge producing some mild concavity of the ventral cord surface and spurring on her left at C4–5 and a mild broad-based disc bulge producing some mild concavity and mild spurring at C5–6. Tr. at 775.

On May 15, 2012, an MRI of Plaintiff's lumbar spine showed facet arthropathy and mild broad-based disc bulging at L4–5 and L5–S1. Tr. at 584. Tr. at 775.

---

[3] Because the current application is for SSI only, the alleged onset date is December 1, 2016, the first day of the month the application was filed. Tr. at 156. However, in the prior application that Plaintiff's attorney requested be reopened, Plaintiff alleged an onset date of April 12, 2014, the day following a prior unfavorable hearing decision. *See* Tr. at 93–110, 129.

On May 11, 2015, x-rays of Plaintiff's cervical spine showed minimal degenerative changes at C5–6 and a probable cervical rib on the left. Tr. at 667. X-rays of her lumbar spine were essentially unremarkable. *Id.*

Plaintiff attended a consultative examination with Stephen Brooks Smith, M.D. ("Dr. Smith"), on June 11, 2015. Tr. at 673–76. She complained of lower back and neck pain related to degenerative disc disease ("DDD"), osteoarthritis, and fibromyalgia. Tr. at 673. She described cramping and pain that radiated down both legs and pain that radiated down both arms and caused numbness in her fingers and hands and difficulty picking up and holding onto items. *Id.* Dr. Smith noted 4/5 grip strength with fair fine and good gross manipulation. Tr. at 674. He recorded normal range of motion ("ROM") of the neck, shoulders, elbows, wrists, fingers, lumbar spine, hips, knees, and ankles. Tr. at 674–75. He noted mild difficulty with heel-to-toe walking and mild-to-moderate difficulty arising from a squat. Tr. at 675. He found 4/5 muscle strength in all proximal muscle groups. *Id.* He noted normal mentation. *Id.* He stated Plaintiff had normal deep tendon reflexes and some mild sensory deficits to light touch of the left lower extremity, primarily in the feet, but no significant sensory deficits overall. *Id.* He did not find sufficient evidence to support functional limitations. *Id.*

On June 23, 2015, state agency medical consultant Dale Van Slooten, M.D. ("Dr. Van Slooten"), reviewed the record and assessed Plaintiff's

physical residual functional capacity ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; and avoid concentrated exposure to hazards. Tr. at 136–38, 148–50.

On June 24, 2015, state agency psychological consultant Sylvie Kendall, Ph.D. ("Dr. Kendall"), reviewed the record and considered listings 12.04 for affective disorders and 12.06 for anxiety-related disorders. Tr. at 133–35, 145–47. She assessed Plaintiff as having no repeated episodes of decompensation and mild restriction of activities of daily living ("ADLs"), difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. *Id.*

Plaintiff presented to Keowee Primary Care & Internal Medicine, P.C., to establish primary care treatment on January 12, 2016. Tr. at 746. She complained of being in a lot of pain and indicated she had taken Norco for several years for fibromyalgia and DDD. *Id.* She requested Norco every four hours and an increased dose of Xanax to treat anxiety. *Id.* She admitted to smoking cigarettes. *Id.* She endorsed mood swings and indicated Effexor had previously been ineffective. *Id.* Nurse Practitioner Jenna Seawright ("NP Seawright"), observed Plaintiff to exhibit some discomfort in changing

positions due to presacral bursitis with multiple trigger points consistent with fibromyalgia. Tr. at 745. She noted Plaintiff was very tearful at times. *Id.* Her impressions were dyslipidemia, metabolic syndrome with insulin resistance and weight gain, thyroiditis, tobacco dependence with chronic obstructive pulmonary disease ("COPD"), polyarthralgia with polymyalgia, polymyalgia rheumatica versus fibromyalgia, chronic cervicalgia with chronic lumbago with DDD, allergic rhinitis with wheezing, generalized anxiety disorder ("GAD") with major depressive disorder ("MDD") with underlying bipolar features, postmenopausal status post-total hysterectomy, B12 deficiency, folate deficiency, vitamin D deficiency, anemia, gastritis post-cholecystectomy, and long-term use of opiates. *Id.* She ordered lab studies, chest x-rays, and pulmonary function testing and requested records from Plaintiff's prior physicians. Tr. at 746. She referred Plaintiff for counseling and started her on Lamictal 100 mg and Vistaril 35 mg, but she declined to refill Xanax. *Id.* Tauqueer Alam, M.D. ("Dr. Alam"), NP Seawright's supervising physician, also examined Plaintiff. *Id.* He agreed to continued Norco 10-325 mg for one month pending receipt of Plaintiff's records. *Id.*

Plaintiff presented to the emergency room at Oconee Memorial Hospital with withdrawal symptoms on January 14, 2016, after having run out of Xanax. Tr. at 677. The attending physician spoke with Dr. Alam, who instructed him to prescribe 0.5 mg of Xanax twice a day for five day and once

a day for five days more. Tr. at 681. Dr. Alam indicated Plaintiff should follow up with him in 10 days. *Id.*

Plaintiff sought refills of Norco and Xanax on February 10, 2016. Tr. at 739. NP Seawright noted multiple fibromyalgia trigger points and indicated Plaintiff was tearful at times with rapidly changing mood during physical exam. Tr. at 740. She recommended Plaintiff take vitamin D and B12 supplements and receive B12 injections. *Id.* She referred Plaintiff to Cannon Psychological Group, increased Lamictal to 150 mg, and refilled Xanax 0.5 mg for two weeks, per Dr. Alam's instruction. *Id.* She declined to refill Norco and advised Plaintiff to follow up with Dr. Patel for chronic lumbago and fibromyalgia. Tr. at 740, 741. She informed Plaintiff that she could not treat her hormonal imbalance until she stopped smoking, as the risks outweighed the benefits. Tr. at 740.

On February 16, 2016, Plaintiff returned to Jay Sanjay Patel, M.D. ("Dr. Patel"), for pain management treatment, after not having been seen since October 2013. Tr. at 852. She reported her insurance had changed and she had been required to follow up with her primary care physician instead. *Id.* Dr. Patel noted Plaintiff was very distraught. *Id.* He prescribed 14 Norco 10-325 tablets pending receipt of Plaintiff's records from her recent providers. *Id.*

Plaintiff followed up with Dr. Patel for treatment of lumbar and neck pain on March 14, 2016. Tr. at 843. Dr. Patel noted tenderness over Plaintiff's bilateral cervical and lumbar paraspinal regions. Tr. at 845. He ordered updated MRIs of Plaintiff's cervical and lumbar spines. Tr. at 846. He prescribed Norco 10-325 mg. Tr. at 847.

Plaintiff complained of significant anxiety and insomnia on April 1, 2016. Tr. at 733. She indicated she had not heard from Cannon Psychological Group as to an appointment. *Id.* She admitted she was taking an increased dose of Xanax to be able to sleep and had run out of the medication early. *Id.* She requested Ambien. *Id.* She also noted she had stopped smoking to start hormone replacement. *Id.* She weighed 162 pounds, and a physical exam was unremarkable. Tr. at 733. Lab studies showed a low level of Lamictal, elevated hemoglobin A1c, and low vitamin D. *Id.* Physician Assistant Leroy Snead ("PA Snead"), instructed Plaintiff to take 2,000 units of vitamin D daily, increased Lamictal to 200 mg a day, refilled Xanax 1 mg, and prescribed Estradiol 1 mg and Ambien 10 mg. Tr. at 734.

Dr. Patel prescribed MS Contin and Norco on April 13, 2016 and May 12, 2016. Tr. at 831–36, 837–42.

On June 3, 2016, Plaintiff complained of feeling tired and fatigued and having no energy, increased blood pressure, and weight gain. Tr. at 724. She requested to restart Cymbalta and B12 injections. *Id.* Dr. Alam ordered blood

work, prescribed Cymbalta 60 mg, ordered B12 injections once a month, and refilled Alprazolam, Ambien, and Lamictal. Tr. at 725–26. He noted he would consider trigger-point injections for Plaintiff's fibromyalgia, if needed. Tr. at 726.

On June 13, 2016, Plaintiff reported taking Norco three times during the day and indicated she was getting no relief at night. Tr. at 828. Dr. Patel instructed Plaintiff to take two Norco during the day and one Norco with MS Contin at night. *Id.* He noted a request for a new MRI of Plaintiff's cervical spine had been denied despite her complaints of increased pain since the last MRI. *Id.* He refilled Plaintiff's medications. Tr. at 830.

Dr. Patel again refilled Plaintiff's prescriptions for Norco and MS Contin on July 12, 2016. Tr. at 819–24.

On August 4, 2016, pulmonary function testing showed mild COPD with moderate small airway disease. Tr. at 749.

Plaintiff followed up with Dr. Patel for medication refills on August 10, 2016. Tr. at 812–18.

Plaintiff complained of fatigue on August 31, 2016. Tr. at 717. She indicated she had previously been prescribed Adderall and Estrogen, but found that Estrogen alone was not sufficient. *Id.* She also complained of acid reflux and dyspnea with mild exertion. *Id.* PA Snead increased vitamin D to 5,000 units a day, prescribed Adderall 10 mg a day, added Estratest for

hormonal imbalance, administered a B12 injection, and referred Plaintiff to Dr. Veera for an esophagogastroduodenoscopy and to Upstate Psychiatry. Tr. at 718.

Plaintiff followed up for pain management for lumbar and neck pain on September 12, 2016. Tr. at 805. Dr. Patel noted tenderness over Plaintiff's bilateral hips. Tr. at 808. He continued Plaintiff's prescriptions for Norco and MS Contin. Tr. at 810.

On September 21, 2016, Plaintiff requested that Adderall be changed back to twice a day instead of once a day. Tr. at 711. PA Snead referred Plaintiff to Dr. Tolmos for gastroesophageal reflux disease, instructed her to follow up with Dr. Alam to discuss disability, prescribed Adderall 10 mg twice a day, and administered a B12 injection. Tr. at 712. He indicated he would check on the psychiatric referral. Tr. at 711, 712.

On November 1, 2016, Plaintiff complained of significant chronic pain that was particularly affecting her neck and lower back. Tr. at 705. She reported she was anxious and not feeling well and requested mood stabilizing and antidepressant medications. *Id.* She noted she had run out of Lexapro. *Id.* She endorsed significant shortness of breath and dyspnea on exertion, but admitted she continued to smoke. *Id.* Dr. Alam noted normal findings on exam, aside from rare rhonchi. Tr. at 706. He noted Plaintiff had been denied disability benefits because she had no primary care physician and indicated

he would give her a letter for disability after reviewing letters from her mental health and pain management providers. Tr. at 707. He prescribed Lexapro 10 mg and indicated the nurse could titrate the dose to 20 mg at Plaintiff's next visit. *Id.* He continued Lamictal at the same dose and noted Alprazolam, Ambien, and Adderall had been refilled. Tr. at 706, 707.

Plaintiff complained of lumbar and neck pain on November 9, 2016. Tr. at 798. Dr. Patel noted tenderness over Plaintiff's bilateral hips on exam. Tr. at 801. He refilled Norco and MS Contin. Tr. at 803.

Plaintiff reported to Anderson-Oconee-Pickens Mental Health Center for an initial clinical assessment on November 15, 2016. Tr. at 686. She reported a history of depression, anxiety, and bipolar disorder that had started in her teens or early twenties. *Id.* She endorsed mood swings and indicated she was frequently nervous and had difficulty getting out of bed on some days. *Id.* She said she had difficulty visiting crowded stores and experienced panic attacks when she was around people for long periods. *Id.* She reported a history of sexual abuse as a child and rape as a teenager and described flashbacks and nightmares that were sometimes triggered by certain smells and music. *Id.* She also endorsed multiple medical problems that included diabetes, DDD, fibromyalgia, arthritis, COPD, and asthma. Tr. at 687. Amanda L. Verner, M.Ed. ("Ms. Verner"), noted the following observations on a mental status exam ("MSE"): neat and clean appearance;

appropriate motor activity; cooperative attitude; tearful affect; euthymic mood; normal speech; normal thought process and content; no evidence of hallucinations or delusions; alert and oriented to person, place, time, and situation; able to make sound decisions; acknowledges and understands problems; intact memory; able to concentrate; average fund of knowledge; sleep characterized by short intervals, nightmares, and insomnia; decreased appetite; and decreased energy. Tr. at 688–89. Ms. Verner assessed other specified trauma and stressor-related disorders and indicated a need to rule out post-traumatic stress disorder ("PTSD"). Tr. at 689. She referred Plaintiff to Foothills Alliance. *Id.*

Plaintiff underwent a sleep study on November 29, 2016. Tr. at 747–48. It showed no evidence of sleep apnea, but significant desaturation as low as 82%. Tr. at 748. Dr. Alam indicated Plaintiff's underlying lung problems should be addressed. *Id.*

Plaintiff complained of neck and lower back pain and reported being out of Norco and MS Contin on December 12, 2016. Tr. at 790. Dr. Patel observed Plaintiff to be tender over her bilateral hips. Tr. at 793. He refilled Plaintiff's medications. Tr. at 797. He discussed with Plaintiff her filing for disability benefits and indicated he would "place her on sedentary duty from [a musculoskeletal] standpoint." *Id.* Plaintiff indicated to Dr. Patel that Dr. Alam "would support her case only if [Dr. Patel] did." *Id.* Dr. Patel indicated

he would contact Dr. Alam to inform him that he supported Plaintiff's disability claim. *Id.*

On December 13, 2016, Plaintiff complained of depression and bipolar symptoms and indicated she was unable to take Lexapro as it worsened her symptoms and made her forgetful. Tr. at 702. Nurse Practitioner Rosemarie Harter ("NP Harter"), noted a cough with shortness of breath and dyspnea, lower leg edema, and right greater than left sacroiliac ("SI") joint and knee pain. Tr. at 703. Plaintiff endorsed short-term memory loss. *Id.* She indicated she was unable to see a psychiatrist because of an insurance issue, but was seeing a therapist. *Id.* NP Harter increased Lamictal to 200 mg twice a day and continued Plaintiff's other medications. Tr. at 704. She referred Plaintiff for a bone density scan, mammogram, and dietary consultation. *Id.*

Plaintiff complained of persistent decreased energy on December 29, 2016. Tr. at 700. She requested her hormone levels be checked. *Id.* PA Snead noted normal findings on exam. *Id.* He increased Plaintiff's vitamin D supplement from 4,000 to 5,000 units per day, increased her B12 injections from monthly to weekly, prescribed Stiolto Resimat for COPD, and refilled her other medications. *Id.*

Plaintiff underwent electromyography ("EMG") and nerve conduction studies ("NCS") on January 5, 2017, that showed median mononeuropathy

across the right wrist that was consistent with a least moderate carpal tunnel syndrome ("CTS"). Tr. at 775.

Plaintiff rated her neck pain as a 10 on January 10, 2017. Tr. at 782. Dr. Patel noted tenderness over Plaintiff's bilateral hips. Tr. at 785. He refilled Norco and MS Contin. Tr. at 783.

Plaintiff requested medication refills on January 30, 2017. Tr. at 698. PA Snead changed Zoloft to 100 mg daily and Xanax to 2mg three times a day. Tr. at 698, 699.

On February 21, 2017, Dr. Patel administered an injection of Triamcinolone and Marcaine to Plaintiff's right greater trochanteric bursa. Tr. at 780–81.

On March 2, 2017, bone density testing showed osteopenia. Tr. at 1068–75.

On March 8, 2017, Plaintiff rated bilateral neck pain as a seven and described sharp, dull, and aching pain. Tr. at 773. She rated lower back pain as a five and described sharp pain, numbness, tenderness, stabbing, throbbing, and shooting. *Id.* Dr. Patel noted tenderness over the right periscapular region. Tr. at 774. He refilled Norco 10-325 mg and MS Contin 30 mg. Tr. at 778. He referred Plaintiff to an orthopedist for treatment of CTS. *Id.*

Plaintiff presented to David G. Cannon, Ph.D. ("Dr. Cannon"), for a mental health consultative exam on March 28, 2017. Tr. at 859–63. Dr. Cannon noted Plaintiff's affect was moderately constricted, her mood seemed possibly depressed, and her speech and appearance were within normal parameters. Tr. at 859. Plaintiff reported symptoms of anger, social isolation, and lack of motivation. Tr. at 860. Dr. Cannon indicated it was possible that Plaintiff was exaggerating her symptoms to some extent. *Id.* He stated Plaintiff did not present a clear history of symptoms of bipolar disorder or PTSD. *Id.* He indicated Plaintiff was oriented times three and had adequate reality contact and orderly thoughts, but questionable judgment and insight. *Id.* He noted Plaintiff recalled one of three items after a four-minute delay and performed serial threes slowly, but adequately. *Id.* He stated Plaintiff should be able to carry out social and daily self-care activities in an independent and sustained fashion and maintain concentration and pace sufficiently to complete tasks in a timely fashion in a work environment, but noted her reported medical difficulties could greatly impair her abilities in these areas. *Id.* His impressions were depressive disorder, not otherwise specified ("NOS"), intermittent explosive disorder, and personality disorder, NOS. Tr. at 861.

Plaintiff rated her neck pain as an eight on April 11, 2017, and indicated it was improved with heat and rest and did not respond to

nonsteroidal anti-inflammatory drugs. Tr. at 916. Dr. Patel refilled Plaintiff's medications and ordered trigger-point injections. Tr. at 917.

On April 12, 2017, Holly L. Partin, LPC ("Counselor Partin"), wrote a letter indicating she had been seeing Plaintiff for outpatient counseling since January 27, 2017. Tr. at 865. She stated Plaintiff's diagnoses were PTSD and moderate bipolar I disorder, with her most recent episode being depression. *Id.* Counselor Partin provided a diagnosis and treatment plan. Tr. at 866. She indicated Plaintiff's problems associated with PTSD included flashbacks, depression, tearfulness, painful memories, childhood trauma, and difficulty in marriages. *Id.* She noted Plaintiff had difficulty sleeping, anxiety, high levels of stress, easy frustration, low tolerance to spontaneous events, and irritability. *Id.* She indicated Plaintiff's bipolar disorder was characterized by mania, depression, difficulty getting out of bed, tearfulness, anhedonia, difficulty keeping marriages and friendships, low self-esteem, difficulty coping with everyday life, difficulty eating on a schedule, and decreased motivation during periods of depression. *Id.*

On April 20, 2017, state agency psychological consultant Rebekah Jackson, Ph.D. ("Dr. Jackson"), reviewed the record and considered listings 12.04 for depressive, bipolar, and related disorders, 12.06 for anxiety and obsessive-compulsive disorders, 12.08 for personality and impulse-control disorders, and 12.11 for neurodevelopmental disorders. Tr. at 161–62. She

assessed mild difficulties in Plaintiff's abilities to understand, remember, or apply information, interact with others, and adapt or manage oneself and moderate difficulties in her abilities to concentrate, persist, or maintain pace. Tr. at 161–62. She completed a mental RFC assessment, noting Plaintiff was moderately limited in her abilities to carry out detailed instructions; to maintain attention and concentration for extended periods; and to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. at 165–67. State agency psychological consultant Craig Horn, Ph.D. ("Dr. Horn"), considered the same listings and assessed the same degree of impairment and mental RFC on August 22, 2017. *Compare* Tr. at 161–62 *and* 165–67, *with* Tr. at 177–78 *and* 182–84.

Plaintiff rated her lower back pain as a nine on May 11, 2017. Tr. at 909. Dr. Patel noted no pain behaviors and refilled Plaintiff's medications. Tr. at 910, 914.

Plaintiff presented to William Scott Brown, M.D. ("Dr. Brown"), with complaints of bilateral hand numbness and tingling on May 24, 2017. Tr. at 868. She complained that symptoms of CTS were waking her during the night and causing her to drop items and have difficulty driving and manipulating small objects. *Id.* She described pain that radiated up to the elbow and numbness predominantly in the radial 3 ½ fingers bilaterally. *Id.*

Dr. Brown observed positive Spurling's sign in the bilateral upper extremities and positive Phalen's and compression tests in the bilateral carpal tunnels. Tr. at 870. He noted Plaintiff had subjective decreased sensation in the median nerve distribution. *Id.* He stated EMG and NCS showed right CTS, but assessed bilateral CTS and cervical radiculopathy. *Id.* He indicated Plaintiff should be scheduled for right carpal tunnel release surgery. *Id.*

Plaintiff presented to Joseph W. O'Quinn, M.D. ("Dr. O'Quinn"), for an initial consultation on June 5, 2017. Tr. at 904. She complained of lower back and knee pain she rated as a nine. *Id.* She described pain associated with weakness, numbness, and tingling that radiated from her lower back to her left buttock and bilateral legs, knees, and feet. *Id.* She stated the pain was not controlled by medication and was worsened by standing, walking, sitting, and bending. *Id.* She also endorsed pain in her neck, elbow, hand, and wrist. *Id.* She indicated her neck pain was associated with numbness, weakness, and tingling. *Id.* She requested Morphine ER 60 mg twice a day and Hydrocodone 10 mg three times a day and to see Dr. Patel for ablation. *Id.* She noted she had an allergic reaction to Gabapentin and Cymbalta had been ineffective. *Id.* Dr. O'Quinn ordered Plaintiff be scheduled with Dr. Patel for lumbar ablation, increased Norco 10-325 mg from twice a day to every eight hours, and continued MS Contin 30 mg every 12 hours. Tr. at 907, 908.

Dr. Brown performed right carpal tunnel release surgery on June 15, 2017. Tr. at 876–79.

On June 27, 2017, Plaintiff endorsed pain at her incision site, but noted her preoperative numbness and tingling had disappeared. Tr. at 880. She requested to proceed with left carpal tunnel release surgery. *Id.* Dr. Brown noted Plaintiff's incision was healing well and she had intact sensation to the median, radial, and ulnar nerve distributions. Tr. at 881. He indicated Plaintiff was able to make a closed fist. *Id.* He observed positive Phalen's test to the left wrist, positive compression test over the left carpal tunnel, and positive Spurling's sign on the left. *Id.* He removed Plaintiff's sutures, referred her for an MRI of the cervical spine, and planned to proceed with left carpal tunnel release surgery. *Id.*

Plaintiff attended a consultative exam with David N. Holt, M.D. ("Dr. Holt"), on June 29, 2017. Tr. at 891–99. Dr. Holt noted the reliability of Plaintiff's history was poor, as she was unable to discuss her problems. Tr. at 891. Plaintiff described pain that began in her neck and radiated into her head that she rated as a seven. Tr. at 892. She described sharp and aching pain and stiffness in her lower back that radiated across her lumbar region and sometimes into her hips, thighs, lower legs, feet, and toes. *Id.* She endorsed CTS, noting she had undergone surgery on the right two weeks prior and the left side had worsened. Tr. at 892–93. She indicated she had a

history of asthma and COPD. Tr. at 893. She said she had recently been diagnosed with diabetes and indicated other diagnoses included fibromyalgia, bipolar disorder, depression, anxiety, and PTSD. *Id.* Dr. Holt noted that Plaintiff "had become impatient and even somewhat hostile" by the time he questioned her as to some of her impairments and instructed him to "just put down something" as she did not care. *Id.* He stated Plaintiff endorsed one panic attack per week if she was not around people, poor appetite, and napping "all throughout the day." *Id.* He indicated Plaintiff reported inability to bathe and dress herself and he could not obtain functional limitations, typical daily activities, or pertinent family history because of her "impatience and inability to deal with further questioning." Tr. at 894.

Dr. Holt stated Plaintiff was "in apparent pain" as evidenced by "a slow gait and holding her right hand, within a brace, in the air." Tr. at 895. He indicated Plaintiff "was slow, groaned, and pushed up on the chair arms to arise," "was also slow and groaned in undressing and dressing but did so independently," and "was slow and groaned in getting onto and off the examining table, without assistance." *Id.* He conducted an 18-point fibromyalgia exam, and Plaintiff scored 43/72 points, which was consistent with a fibromyalgia diagnosis. *Id.* He noted tenderness in Plaintiff's cervical, thoracic, and lumbar spine, SI area, and bilateral knees. Tr. at 896. He

performed limited testing on Plaintiff's right hand, as she had recently had surgery. *Id.*

Dr. Holt noted positive bilateral Spurling's sign and positive straight-leg raising ("SLR") test in the supine position on the left and right. Tr. at 888. He recorded cervical flexion to 30/50 degrees, cervical extension to 50/60 degrees, cervical lateral flexion to 30/45 degrees bilaterally, cervical rotation to 60/80 degrees bilaterally, lumbar flexion to 50/90 degrees, lumbar extension to 20/25 degrees, lumbar lateral flexion to 20/25 degrees bilaterally, shoulder abduction to 90/150 degrees bilaterally, shoulder forward elevation to 90/150 degrees bilaterally, shoulder internal rotation to 60/80 degrees bilaterally, shoulder external rotation to 60/90 degrees bilaterally, elbow flexion to 130/150 degrees bilaterally, elbow supination to 60/80 degrees bilaterally, elbow pronation to 60/80 degrees bilaterally, left wrist dorsiflexion and palmar flexion to 55/60 degrees, knee flexion to 145/150 degrees bilaterally, hip abduction to 30/40 degrees bilaterally, hip adduction to 15/20 degrees bilaterally, hip flexion to 80/100 degrees bilaterally, hip internal rotation to 35/40 degrees bilaterally, hip external rotation to 40/50 degrees bilaterally, hip extension to 25/30 degrees bilaterally, ankle dorsiflexion to 15/20 degrees bilaterally, and ankle palmar flexion to 30/40 degrees bilaterally. *Id.* He noted positive swelling in the proximal interphalangeal ("PIP"), metacarpophalangeal ("MCP"), and carpometacarpal

("CMC") joints of the left hand and in the distal interphalangeal ("DIP"), PIP, and MCP joints of the right hand. *Id.* He recorded 5/5 grip strength on the left and 2/5 grip strength on the right and abnormal fine and gross manipulation bilaterally. Tr. at 889. He indicated Plaintiff had normal strength on tandem walk, but mild weakness or movement against some resistance when squatting and performing heel and toe walking. *Id.* He noted 5/5 proximal and distal strength in the left upper extremity and bilateral lower extremities, no atrophy, trace reflexes in the bilateral upper extremities, 1+ reflexes in the bilateral lower extremities, and 2+ peripheral pulses in the bilateral upper and lower extremities. *Id.*

> Dr. Holt provided the following impression:
>
> [Plaintiff] had an unusual presentation of lack of social awareness, exhibiting impatience and lack of communication. She seemed strongly positive in her problems with mental health issues, although in history that she gave, she seemed to downplay their intensity. She was quite rude to the staff members. When with me, she then did much better.
>
> Upper and low back pain in particular was demonstrated throughout. The 2 week postop right CTS surgery may have been made dramatic by her holding it up in the air like a flag. For one who has frequent bronchitis, chronic asthma, and now COPD, she wasn't heard to cough once, and although breath sounds were bronchial in nature, there were no wheezes, rales, or rhonchi.

Tr. at 897. His diagnostic impressions were: cervical DDD at C4–6 and C5–6 with mild impingement on the ventral surface of the cord; lumbar lesser DDD than cervical at L4–5 and L5–S1, with suggested current radiculopathy

bilaterally; bilateral CTS with negative Tinel's and Phalen's on the left; fibromyalgia; history of asthma, chronic bronchitis, and COPD with exam finding of bronchial breath sounds only; heavy cigarette smoking from age 11 to 37, with cessation at that point; bipolar disease, anxiety, and PTSD; diabetes mellitus type II without initiation of treatment; stated history of non-alcoholic pancreatitis last in 2015; and recurrent and fairly severe ROM study results. Tr. at 897–98.

> Dr. Holt further commented:
>
> [Plaintiff] was initially uncooperative before settling down. It was probably her mental health issues that disrupted her ability to remember facts. The history regarding her cervical and lumbar DDD is unclear, and it may be that she has had further MRIs since those of 2010 and 2013. There were other inconsistencies as well. She reported applying for disability "multiple times." It was encouraging to hear that she feels some progress from her psychological counseling, and to see that she is progressing with the CTS problem. Her ROM chart looks to have problems throughout that system, and it is impossible to know how reliable those results are. Unfortunately, she was simply unable, because of emotional upset, to present a level of functional difficulties.

Tr. at 898.

On August 8, 2017, state agency medical consultant Kimberley Patton, M.D. ("Dr. Patton"), assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 10 pounds; frequently lift and/or carry less than 10 pounds; stand and/or walk for about 2 hours; sit for about six hours in an eight-hour workday; frequently stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ladders, ropes, or scaffolds; and avoid concentrated exposure to

hazards, extreme cold, extreme heat, humidity, and fumes, odors, dusts, gases, poor ventilation, etc. Tr. at 163–65. James Taylor, D.O. ("Dr. Taylor"), another state agency medical consultant, assessed the same physical RFC on August 22, 2017. *Compare* Tr. at 163–65, *with* Tr. at 180–82.

Plaintiff complained of chronic fatigue on April 6, 2018. Tr. at 936. She indicated she had run out of hormone patches three days prior and noted a difference, as the patches helped with hot flashes and night sweats. Tr. at 937. She stated she was taking Adderall, but it was not helping her symptoms. *Id.* Plaintiff's weight had increased to 177 pounds. Tr. at 938. Sara J. Healy, M.D. ("Dr. Healy"), indicated Plaintiff's cortisol and thyroid-stimulating hormone ("TSH") levels were within normal limits. Tr. at 940. She refilled Plaintiff's estrogen patches. *Id.*

On October 1, 2018, Plaintiff presented to Charles Christopher Kanos ("Dr. Kanos"), for follow up as to cervical radiculopathy. Tr. at 929–32. She described severe right trapezius pain that radiated down her right arm into her hand and chronic low back pain that radiated into her left thigh. Tr. at 929. Dr. Kanos noted right SI tenderness with tender and painful ROM, as well as normal exams of the left SI joint, right and left trochanters, hips, and back. Tr. at 930. He recorded 5/5 grip, wrist pain with flexion, normal reflexes, positive Spurling's maneuver on the right and negative on the left, negative bilateral SLR, and negative Hoffman's sign. Tr. at 931. He stated

Plaintiff's MRI showed mild bulging at C5–6 without significant stenosis. Tr. at 932. He did not "feel that her MRI clearly explain[ed] her arm and shoulder symptoms." *Id.* He offered no further treatment for Plaintiff's neck, as he did not feel that there was enough stenosis to warrant injections. *Id.*

Plaintiff's pulse was elevated at 120 beats per minute on October 9, 2018. Tr. at 948. She complained of weight gain, chronic fatigue, and hot flashes and indicated estrogen patches were helpful, but were not remaining on her skin. *Id.* She requested a different estrogen patch. *Id.* Dr. Healy switched Plaintiff to a twice-a-week patch. Tr. at 951.

PA Snead refilled Plaintiff's medications on November 28, 2018. Tr. at 1078.

On December 26, 2018, Plaintiff returned for medication refills. She weighed 171.6 pounds. Tr. at 1078.

Plaintiff returned to PA Snead for medication refills on January 25 and February 25, 2019. Tr. at 1078.

Plaintiff requested medication refills on March 25, 2019. Tr. at 1079. She complained of worsening shortness of breath, chronic pain, and trouble ambulating with impaired balance and falls. *Id.* She reported extreme anxiety and depression that kept her from leaving her house. *Id.* She endorsed CTS with poor grip. *Id.* She indicated Sertraline and Seroquel were not addressing her depression and requested increased doses. *Id.* She asked

to be referred to Community Long Term Care for assistance in her home. *Id.* PA Snead observed that Plaintiff appeared very anxious. *Id.* He referred her for a bone density scan and NCS, wrote a prescription for Community Long Term Care, and increased Seroquel to 400 mg twice a day and Sertraline to 200 mg twice a day. *Id.*

### C.    The Administrative Proceedings

#### 1.    The Administrative Hearing

##### a.    Plaintiff's Testimony

At the hearing, Plaintiff testified she worked in 2004 and 2005 as a manager for a cash advance business. Tr. at 40. She indicated she hired and fired employees and scheduled employees to work. *Id.* She said she subsequently worked for a temporary agency, where she was placed in a job as an office assistant and performed tasks that included scanning documents and answering telephones. Tr. at 41. She stated she worked in 2007 for Oconee Publishing as a secretary in a newspaper office. *Id.* She noted she did bookkeeping and managed payroll. *Id.* She stated she also worked as a manager at Wal-Mart. Tr. at 42.

Plaintiff testified she was unable to work because of daily pain that kept her in bed most of the time. Tr. at 42. She said she was "sick" in her body and mind. *Id.* She stated she had bipolar disorder. *Id.* She indicated she experienced panic attacks and difficulty being around people. *Id.* She said

COPD made it so that she could not breathe. *Id.* She indicated she had a rapid heartrate. *Id.* She said she could not walk, sit, or lie down for very long and had to have help in everything she did. *Id.*

Plaintiff estimated she could walk for 15 minutes, depending on the weather, which affected her breathing and other abilities. Tr. at 42–43. She said she could sit for 15 to 20 minutes before she had to lie down. Tr. at 42. She stated sitting made her whole body hurt and cramp up. Tr. at 43.

Plaintiff testified her medication caused her to sleep a lot. *Id.* She said she had severe episodes related to her bipolar disorder during which she would get angry and throw things. Tr. at 44. She also described episodes during which she would "ball up," shake, and cry. *Id.* She said her episodes were triggered by smell and locations and occurred five or six times a week. *Id.* She stated she had vivid nightmares and restless sleep, but admitted she was taking medication that better controlled these symptoms. *Id.*

Plaintiff testified fibromyalgia caused her to experience pain all over, but especially in her lower back, arms, shoulders, hips, and legs. *Id.* She stated she also had DDD, osteoporosis, and arthritis. Tr. at 45. She stated she took Hydrocodone and Morphine that provided some relief, but made her "very sleepy and very woozy." Tr. at 44–45. She said she also had chronic fatigue and required assistance from an aide who served her through Community Long Term Care on five days a week. Tr. at 45.

Plaintiff stated problems with her shoulders prevented her from lifting her arms. *Id.* She indicated she had undergone carpal tunnel release on the right side that had not provided a lot of relief. *Id.* She noted her doctor had delayed surgery on the left because she developed increased right shoulder pain following the surgery. *Id.* She stated she had lost use and control of both hands and often dropped items. Tr. at 46. She denied being able to use her hands for repetitive movements for long periods. *Id.*

Plaintiff testified she did not bend, stoop, or crouch because those activities affected her breathing and heart rate and she had difficulty getting up. *Id.* She denied preparing meals, washing dishes, shopping for groceries, driving, and visiting friends or relatives. Tr. at 47. She said she had difficulty getting along with people, was bothered by noises and crowds, and had problems with her memory and concentration due to attention deficit hyperactivity disorder ("ADHD"). *Id.* She noted she had difficulty keeping up with and remaining awake to watch television. Tr. at 48. She denied smoking. *Id.*

b.    Vocational Expert Testimony

Vocational Expert ("VE") Iric C. Saldivar reviewed the record and testified at the hearing. Tr. at 49–52. The VE categorized Plaintiff's PRW as a retail manager, *Dictionary of Occupational Titles* ("*DOT*") number 185.167-046, as having a specific vocational preparation ("SVP") of seven and

requiring light exertion as described in the *DOT* and medium exertion as Plaintiff performed it. Tr. at 49. He described PRW as a bookkeeper, *DOT* number 210.382-014, with an SVP of six and requiring sedentary exertion as described in the *DOT* and light exertion as Plaintiff performed it. *Id.* He identified Plaintiff's additional PRW as a financial manager, *DOT* number 186.167-086, as requiring sedentary exertion with an SVP of eight, and an administrative clerk, *DOT* number 219.362-010, as requiring light exertion with an SVP of four. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift, carry, push, and pull 10 pounds occasionally and less than 10 pounds frequently; stand and walk for two hours in an eight-hour workday; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently, but not constantly, reach in all directions bilaterally; frequently, but not constantly, handle and finger bilaterally; and understand, remember, and carry out simple, routine, and repetitive tasks requiring no more than one, two, or three-step instructions, free of any fast-paced production requirements, and involving only simple work-related decisions and occasional decision making and changes in the work setting. Tr. at 49– 50. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. Tr. at 50. The ALJ asked whether there were any other jobs in the economy that the hypothetical person could perform. *Id.* The

VE identified sedentary jobs with an SVP of two as a bench hand worker, *DOT* number 700.687-062, a dowel inspector, *DOT* number 669.687-014, and a table worker, *DOT* number 739.687-182, with 30,000, 13,000, and 12,000 positions in the national economy, respectively. *Id.*

For a second hypothetical question, the ALJ asked the VE if the individual could perform the same jobs if limited to occasional handling and fingering. Tr. at 50–51. The VE testified the individual would be unable to perform those jobs or any other jobs. Tr. at 51.

For a third hypothetical question, the ALJ asked the VE to consider the restrictions in the first hypothetical question, but to further assume the individual would require two to three rest periods of 15 minutes each over the course of an eight-hour day to alleviate pain. *Id.* The ALJ asked if the individual would be able to perform the jobs the VE previously identified. *Id.* The VE testified she would not. *Id.* The ALJ asked if there were other jobs the individual could perform. *Id.* The VE stated there would be no jobs. *Id.*

The ALJ asked the VE if the *DOT* addressed reaching direction and rest periods. *Id.* The VE stated it did not and explained that portion of his testimony was based on his observation, training, and experience. Tr. at 51– 52. The ALJ asked the VE if the remainder of his testimony was consistent with the *DOT*. Tr. at 52. The VE testified that it was. *Id.*

2. Post-Hearing Evidence

a. Medical Interrogatories

On May 1, 2019, the ALJ solicited an opinion from Steven S. Goldstein, M.D. ("Dr. Goldstein"). Tr. at 1083. She requested that Dr. Goldstein review the relevant exhibits and complete interrogatories based on the evidence provided and his professional knowledge. *Id.*

Dr. Goldstein completed the interrogatories on May 8, 2019. Tr. at 1104–06. He identified Plaintiff's impairments as DDD of the cervical and lumbar spine, body mass index of 33, chronic opioid and Xanax use, CTS status post-surgery bilaterally, and fibromyalgia. Tr. at 1104. He specifically considered listings 1.04 and 11.14 and found that Plaintiff's impairments did not meet or equal a listing. Tr. at 1105.

Dr. Goldstein completed a medical statement of ability to do physical work-related activities form on May 9, 2019. Tr. at 1098–1102. He indicated Plaintiff had the following limitations: lift and carry up to 10 pounds frequently and 11 to 20 pounds occasionally; sit for three hours at a time and six hours in an eight-hour workday; stand for three hours at a time and six hours in an eight-hour workday; walk for three hours at a time and six hours in an eight-hour workday; never climb ladders or scaffolds; occasionally balance, stoop, kneel, crouch, crawl, and climb stairs and ramps; occasionally tolerate unprotected heights, moving mechanical parts, operating a motor

31

vehicle, dust, odors, fumes, and pulmonary irritants; and frequently tolerate humidity, wetness, extreme cold, extreme heat, and vibrations. Tr. at 1098–1101. He indicated Plaintiff could perform activities like shopping; travel without a companion for assistance; ambulate without using a wheelchair, walker, or two canes or two crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single handrail; prepare a simple meal and feed herself; care for her personal hygiene; and sort, handle, or use paper or files. Tr. at 1102.

### b.   Vocational Interrogatories

On June 7, 2019, the ALJ requested an opinion from VE Kay S. Gilreath. Tr. at 490. She asked that the VE review selected exhibits and provide responses to vocational interrogatories. *Id.* The VE indicated Plaintiff's PRW included that of a retail manager, *DOT* number 185.167-046, with an SVP of seven and requiring light exertion per the *DOT* and medium exertion as performed; a bookkeeper, *DOT* number 210.382-014, with an SVP of six and requiring sedentary exertion per the *DOT* and light exertion as performed; a financial manager, *DOT* number 186.167-086, with an SVP of eight and requiring sedentary exertion; and an administrative clerk, *DOT* number 219.362-010, with an SVP of four and requiring light exertion. Tr. at 495. The ALJ asked the VE to consider a hypothetical individual of Plaintiff's

vocational profile who could perform sedentary work requiring she stand or walk for two of eight hours; occasionally climb ramps or stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; frequently, but not constantly, reach in all directions bilaterally; frequently, but not constantly, handle and reach bilaterally; not work in extreme heat or cold; tolerate occasional exposure to wetness, humidity, dusts, gases, fumes, odors, pulmonary irritants, and poor ventilation; not work at unprotected heights or around moving mechanical parts or open flames or bodies of water; and understand, remember, and carry out simple, routine, and repetitive tasks requiring no more than one to two to three step instructions, free of any fast-paced production requirements and involving only simple work-related decisions and occasional decision making, changes in the work setting, and interaction with supervisors, coworkers, and the public. Tr. at 496. The VE noted the individual would be unable to perform Plaintiff's PRW because two of her prior jobs were at the light exertional level and the two prior jobs at the sedentary level were "complex skilled jobs." *Id.* She identified other jobs that the individual could perform given the restrictions as those of a document preparer, *DOT* number 249.587-018, an optical goods worker, *DOT* number 713.684-038, and a sorter, *DOT* number 521.687-086, with 60,000, 10,000, and 100,000 positions in the national

economy, respectively. Tr. at 497. She denied conflicts between her testimony

and the *DOT*. *Id.*

       3.     The ALJ's Findings

In her decision dated July 31, 2019, the ALJ made the following

findings of fact and conclusions of law:

1.     The claimant has not engaged in substantial gainful activity since December 20, 2016, the application date (20 CFR 416.971 *et seq.*).

2.     The claimant has the following severe impairments: cervical and lumbar spine degenerative disease, bilateral cervical radiculopathy; chronic obstructive pulmonary disease (COPD); bilateral carpal tunnel syndrome, post right release; fibromyalgia; obesity; bipolar disorder; depressive disorder; personality disorder; intermittent explosive disorder; and post-traumatic stress disorder (PTSD) (20 CFR 416.920(c)).

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) with additional limitations. Specifically, the claimant can stand/walk 2/8; occasionally climb ramps and/or stairs, but cannot climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and frequently but not constantly reach in all directions bilaterally. The claimant can frequently but not constantly handle and finger bilaterally; cannot work in extreme heat or cold; can tolerate occasional exposure to wetness, humidity, dusts, gases, fumes, odors, pulmonary irritants and poor ventilation; and cannot work at unprotected heights or around moving mechanical parts or open flames or bodies of water. Mentally, the claimant can understand, remember and carry out simple, routine and repetitive tasks requiring no more than 1–2–3 step instructions, free of any fast paced production requirements and involving only simple work related decisions

and occasional decision making, changes in the work setting and interaction with supervisors, co-workers and the public.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on October 4, 1976 and was 40 years old, which is defined as a younger individual age 18–44, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since December 20, 2016, the date the application was filed (20 CFR 416.920(g)).

Tr. at 14–22.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to identify and resolve apparent conflicts between the VE's testimony and the *DOT*'s job descriptions; and

2)    the ALJ did not adequately consider and weigh the medical opinions of record.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4)

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20

whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant

---

C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson*

*v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Alleged Conflict Between VE's Testimony and the *DOT*

Plaintiff argues the ALJ failed to identify and resolve apparent conflicts between the VE's testimony and the job descriptions in the *DOT*.

[ECF No. 18 at 9–16]. She maintains the jobs of document preparer with a general educational development ("GED") reasoning level of three and optical goods worker with a reasoning level of two appear to conflict with the provisions in the RFC assessment for one-, two-, and three-step instructions involving only simple work-related decisions. *Id.* at 13. She concedes the VE identified no conflicts in response to the ALJ's inquiry, but contends the ALJ failed to take the steps to independently identify and resolve the apparent conflicts. *Id.* at 15. She claims the ALJ failed to resolve an apparent conflict between the *DOT*'s description of the job of sorter and the provision in the RFC assessment for no fast-paced production requirements. *Id.* at 16. In her reply brief, Plaintiff argues that the Social Security Administration's ("SSA's") Program Operations Manual Systems ("POMS") requires ALJs to identify three occupations that a claimant can perform, except in unusual circumstances.[6] [ECF No. 20 at 3].

The Commissioner concedes that the ALJ failed to resolve apparent conflicts between the VE's testimony and the *DOT*'s descriptions of the jobs of document preparer and sorter, but argues there was no apparent conflict between the VE's testimony and the *DOT*'s description of the job of optical goods worker. [ECF No. 19 at 10]. He cites *Lawrence v. Saul*, 941 F.3d 140 (4th Cir. 2019), as indicating there is no conflict between an RFC requiring

---

[6] The undersigned declines to address this issue, as Plaintiff's original argument is dispositive.

"simple, routine, repetitive tasks of unskilled work" and reasoning level two. *Id.* He notes the court distinguished "short instructions" from "simple, routine, and repetitive tasks" and maintains that no conflict exists because the RFC did not limit Plaintiff to short instructions. *Id.*

Pertinent to the parties' arguments, the ALJ specified Plaintiff had the RFC to "understand, remember and carry out simple, routine and repetitive tasks requiring no more than 1–2–3 step instructions." Tr. at 17. She concluded Plaintiff's RFC would not permit her to perform her PRW. Tr. at 21. She found that the second VE's responses to the interrogatories were consistent with the information in the *DOT* and relied on her identification of the jobs of optical goods worker, document preparer, and sorter to satisfy the Commissioner's burden at step five. *See* Tr. at 22.

If the claimant is unable to perform her PRW, "the Commissioner bears the burden to prove that [she] is able to perform alternative work." *Pearson v. Colvin*, 810 F.3d 204, 207 (4th Cir. 2015) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)). Given the Commissioner's concessions as to the jobs of document preparer and sorter, if the ALJ erred in finding Plaintiff could perform work as an optical goods worker, she failed to sustain the Commissioner's burden at step five.

The court is left to determine whether the ALJ erred in failing to identify and resolve an apparent conflict between the VE's testimony and the

*DOT* as to the job of optical goods worker. The SSA relies primarily on the *DOT* for information about the requirements of work in the national economy, and ALJs are required to take administrative notice of information contained therein and consider it in assessing claimants' abilities to perform specific jobs. 20 C.F.R. §§ 404.1566(d), 416.966(d). ALJs may obtain testimony from VEs to address more complex vocational issues, such as whether claimants' work skills can be used in other work and specific occupations that allow for use of particular skills. 20 C.F.R. §§ 404.1566(e), 416.966I.

Because the SSA recognized that VEs' opinions might appear to conflict with the information in the *DOT*, it promulgated SSR 00-4p to explain how apparent conflicts should be resolved. In *Pearson*, 810 F.3d at 209–10, the court explained as follows:

> The "apparent" conflict standard . . . embraces the reality that, in many cases, testimony may only appear to conflict with the *Dictionary*, and the vocational expert may be able to explain that, in fact, no conflict exists. However, if the ALJ does not elicit this explanation, then the expert's testimony cannot provide substantial evidence to support the ALJ's decision. An expert's testimony that apparently conflicts with the *Dictionary* can only provide substantial evidence if the ALJ has received this explanation from the expert and determined that the explanation is reasonable and provides a basis for relying on the testimony rather than the *Dictionary*.

The court held that SSR 00-4p "require[s] the *ALJ* (not the vocational expert) to '[i]dentify and obtain a reasonable explanation' for conflicts between the

vocational expert's testimony and the *Dictionary*, and to '[e]xplain in the determination or decision how any conflict that has been identified was resolved.'" *Id.* at 208 (emphasis in original).

The parties' arguments center on whether Plaintiff could perform a job with a reasoning level of two given the restriction in the RFC assessment for "simple, routine and repetitive tasks requiring no more than 1–2–3 step instructions," Tr. at 17. Jobs with a reasoning level of two require workers to "[d]eal with problems involving a few concrete variables in or from standardized situations." *DOT*, 1991 WL 688702 (2016). "Unlike GED reasoning Code 1, which requires the ability to '[a]pply commonsense understanding to carry out simple one-or-two step instructions,' GED Reasoning Code 2 requires the employee to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.'" *Henderson v. Colvin*, 643 F. App'x 273, 277 (4th Cir. 2016) (citing *DOT*, 1991 WL 688702 (2008)); *Rounds v. Comm'r*, 807 F.3d 996, 1003 (9th Cir. 2015) (holding that reasoning code two requires additional reasoning and understanding above the ability to complete one-or-two step tasks). In *Henderson*, 643 F. App'x at 277, the court acknowledged that "there is an apparent conflict between an RFC that limits [a claimant] to one-to-two step instructions and GED reasoning Code 2, which requires the ability to understand detailed instructions."

The Fourth Circuit subsequently addressed issues involving VE testimony as to GED reasoning level two in two published opinions. In *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019), the court found that the ALJ erred in failing to resolve an apparent conflict between the claimant's RFC limiting her to jobs involving "short, simple instructions" and the jobs the VE identified that required a reasoning level of two. It noted that the plaintiff, "being limited to short, simple instructions, may not be able to carry out detailed but uninvolved instructions." *Id.* at 314. In *Lawrence*, 941 F.3d at 143, the court found a restriction to "simple, routine repetitive tasks of unskilled work" was not inconsistent with "Level 2's notions of 'detailed but uninvolved . . . instructions' and tasks with 'a few [ ] variables.'" It distinguished the RFC at issue from that in *Thomas*, noting: "the key difference is that Thomas was limited to 'short' instructions. 'Short is inconsistent with 'detailed' because detail and length are highly correlated. Generally, the longer the instructions, the more detail they can include." *Id.* The court explained:

> To begin with, detailed instructions are, in the main, less correlated with complexity than with length. Instructions often include many steps, each of which is straightforward. Driving directions are a good example: they may prescribe many turns, but the turns are generally easy to make, and the route rarely changes, making the directions simple, routine, and repetitive. Further, there is no conflict between "simple" and "uninvolved" instructions, as both connote instructions that "are not complicated or intricate." *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010) (citing *Webster's Third New Int'l Dictionary*, 1191,

2499 (2002)). Finally, "routine" and "repetitive tasks" may involve a few variables, just as driving directions may vary if a road is closed.

*Id.* at 143–44.

The ALJ's RFC assessment is like that in *Lawrence* in that it allows for "simple, routine, repetitive tasks." *Compare* Tr. at 17, *with Lawrence*, 941 F.3d at 143. However, it limits Plaintiff to "tasks requiring no more than 1–2–3 step instructions," making it akin to the "short" instructions addressed in *Thomas*. *Compare* Tr. at 17, *with Thomas*, 916 F.3d at 313–14.

The ALJ's inclusion of three-step instructions arguably suggests greater ability than that at GED reasoning level one. *See DOT*, App'x C, 1991 WL 688702 (2016) (providing jobs at level one require the individual to "[a]pply commonsense understanding to carry out simple one- or two-step instructions"); *see also Spurlock v. Berryhill*, C/A No. 1:17-411, 2018 WL 791302 at *6–7 (M.D.N.C. Feb. 8, 2018), adopted by 2018 WL 4931610 (M.D.N.C. Mar. 21, 2018) (rejecting the plaintiff's argument that a limitation in the RFC assessment to "one to three step instructions" was inconsistent with GED reasoning level two and noting the specific restriction "on its face, requires more mental ability than the one to two step instructions of [reasoning level] 1")).[7] However, Plaintiff might not be able to satisfy all the requirements of a job at GED reasoning level two because the job could

---

[7] *Spurlock* was decided prior to *Thomas* and *Lawrence*.

reasonably involve more than three-step instructions. Such a scenario is illustrated by the court's example in *Lawrence*, 941 F.3d at 144. Another court that considered a restriction to one- to three-step instructions following the decision in *Thomas* found that an apparent conflict existed between the VE's testimony and the *DOT*'s indication that the job required a GED reasoning level of two. *See Dellinger v. Berryhill*, C/A No. 3:17-676-RJC-DSC, 2019 WL 1325929 at *4 (W.D.N.C. Mar. 25, 2019).

The undersigned's review of the job of optical goods worker further suggests it requires more than three steps. The *DOT* describes the job as follows:

> Polishes eyeglass frames and temple pieces to remove scratches and pit marks, using polishing wheel: Applies abrasive compound to wheel surface, using brush. Starts machine and holds and turns frame parts against wheel to polish parts and remove defects. Inspects and feels polished parts to verify removal of flaws. Presses sandpaper against polishing wheel to remove abrasive residue in preparation for next sequence.

713.684-038, POLISHER, EYEGLASS FRAMES. *DOT* (4th Ed., Rev. 1991). 1991 WL 679267.

Given the court's emphasis on the length of the instructions in *Lawrence* and the *DOT's* description of the job of optical goods worker, the undersigned is constrained to find that the ALJ failed to resolve an apparent conflict as to the remaining job. Because the ALJ cited three jobs that

apparently conflict with the *DOT* and failed to resolve the conflicts, she did not sustain the Commissioner's burden at step five.

### 2.    Evaluation of Medical Opinions

Plaintiff argues the ALJ failed to properly consider and weigh the medical opinions of record. [ECF No. 18 at 17–35]. The Commissioner maintains the ALJ appropriately assessed the medical opinion evidence. [ECF No. 19 at 11–14].

Because Plaintiff's applications for benefits were filed prior to March 27, 2017, the rules and regulations in 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, and 06-3p apply. *See* 20 C.F.R. §§ 404.1520c, 416.920c (stating "[f]or claims filed before March 27, 2017, the rules in § 404.1527 [§ 416.927] apply"); *see also* 82 Fed. Reg. 15,263 (stating the rescissions of SSR 96-2p, 96-5p, and 06-3p were effective for "claims filed on or after March 27, 2017").

Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [her] symptoms, diagnosis and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." SSR 96-5p (quoting 20 C.F.R. §§ 404.927(a)(2), 416.927(a)(2)). ALJs are required to "evaluate every medical opinion [they] receive." 20 C.F.R. §§ 404.1527(c), 416.927(c).

If the record contains an opinion from a treating source who is an acceptable medical source pursuant to the regulations, the ALJ is required to accord controlling weight to that opinion if it is well supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c). If the record contains no opinion from an acceptable treating medical source or if the ALJ declines to accord controlling weight to the acceptable treating medical source's opinion, she is required to weigh all the medical opinions of record based on the following factors: "(1) whether the physician examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654 (citing 20 C.F.R. § 404.1527(c)). The factors in 20 C.F.R. § 404.1527(c) "explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources.'" SSR 06-3p, 2006 WL 2329939 at *4 (2006). Nevertheless, these factors represent basic principles for the consideration of all opinion evidence. *Id.*

The undersigned addresses Plaintiff's arguments considering the foregoing authority.

a.    Dr. Holt's Opinion

Plaintiff argues the ALJ did not allocate any particular weight to Dr. Holt's opinion, despite her obligation to weigh all the medical opinions of record. [ECF No. 18 at 22–24]. She maintains the ALJ failed to acknowledge Dr. Holt's findings of reduced ROM; tenderness to her cervical, thoracic, and lumbar spines; decreased DTRs at the elbows and knees; positive SLR bilaterally at 40 degrees; 3/5 grip strength on the left; decreased sensation in the right forearm, left thigh, left lower leg, and the plantar surfaces of both feet; and highly-positive fibromyalgia test results. *Id.* at 21–22. She contends Dr. Holt's findings as to her difficulties relating to others and communicating appropriately were consistent with Dr. Alam's and PA Snead's assessments. *Id.* at 22, 24. She claims the ALJ disregarded portions of Dr. Holt's opinion that supported her claim. [ECF No. 20 at 5].

The Commissioner argues the ALJ did not err in failing to assess Dr. Holt's opinion because Dr. Holt provided no opinion. [ECF No. 19 at 11]. He maintains Dr. Holt indicated he could not obtain Plaintiff's functional status due to her emotional upset. *Id.* at 12.

Although Dr. Holt was unable to assess Plaintiff's functional limitations, he provided judgments as to Plaintiff's symptoms consistent with a medical opinion. Dr. Holt stated Plaintiff was "in apparent pain" as evidenced by "a slow gait and holding her right hand, within a brace, in the

air." Tr. at 895. He noted objective evidence of symptoms on physical exam that included 43/72 points on a fibromyalgia exam, positive bilateral Spurling's sign, positive bilateral SLR in the supine position, reduced ROM in multiple joints throughout the body, swelling in multiple joints of the hands, abnormal fine and gross manipulation bilaterally, reduced ability to squat and perform heel and toe walking, and decreased reflexes in the upper and lower extremities. Tr. at 888, 889, 895. He also noted mental abnormalities that included "lack of social awareness," impatience, "lack of communication," and "because of emotional upset," an inability "to present a level of functional difficulties" Tr. at 897, 898. However, he admitted there were inconsistencies and that he was not convinced as to the reliability of ROM testing. Tr. at 898.

The ALJ discussed Dr. Holt's findings as follows:

> Upon examination, the claimant exhibited a slow gait but otherwise normal. The claimant did not use an assistive device. The claimant was slow and groaned through the examination but performed movements without assistance (B19F, page 5). There was insignificant tenderness in the lumbar spine and localized tenderness in the hip and knees. Examining physician David Holt, M.D., noted the claimant had an unusual presentation of lack of social awareness, exhibiting impatience and lack of communication. Despite a reported history of bronchitis, chronic asthma, and COPD, the claimant did not cough once during the examination and upon examination, there were no wheezes, rales, or rhonchi. (Exhibit B19F, page 7). Dr. Holt noted the claimant was unable to present a level of functional difficulties but reported progress from her psychological counseling (Exhibit B19F, page 8).

Tr. at 19–20.

The ALJ failed to note many of Dr. Holt's abnormal exam findings and to weigh his opinion. She could have reasonably rejected parts of Dr. Holt's opinion, as he questioned the reliability of some aspects of his own opinion. However, her recitation of only some of his findings is inadequate. The applicable regulations require the ALJ to more thoroughly consider whether Dr. Holt's opinion as to Plaintiff's symptoms is supported by his exam and consistent with the other evidence of record. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). As Plaintiff points out, Dr. Holt's impressions as to her mental presentation are arguably consistent with those of Dr. Alam and PA Snead. The ALJ should have reconciled this evidence, and she erred in failing to do so.

### b.    Dr. Alam's Opinion

On April 12, 2017, Dr. Alam discussed Plaintiff's diagnoses and treatment history and noted Plaintiff had "very low interpersonal skills," was "unable to withstand any stress and pressure," and had "chronic pain with spinal DDD [of the cervical and lumbar] spine." Tr. at 864. He wrote the following:

> Due to her chronic fatigue, PTSD, bipolar type I with moderate and most recurrent episodes of depression with poor interpersonal skills and unable to withstand any stress with spinal DDD, stenosis and seeing a specialist for her pain management with other conditions of COPD, post-ablative ovarian failure she is unable to do meaningful employment and has applied for disability.

*Id.*

Plaintiff argues the ALJ cited insufficient reasons for rejecting Dr. Alam's opinion. [ECF No. 18 at 27]. She maintains Dr. Alam's notes showed that she had worsening shortness of breath, difficulty ambulating, extreme anxiety and depression, and significant pain, despite participating in pain management treatment. *Id.* at 27–28. She contends the ALJ erred in rejecting Dr. Alam's opinion because the record lacked objective evidence to support her fibromyalgia-related pain. *Id.* at 28. She claims the ALJ also rejected Dr. Alam's opinion based on her ADLs without explaining how they conflicted with the opinion, considering the parameters within which she could perform them, or addressing a decline in her abilities over time that led to an order for an in-home aide. *Id.* at 28–30; ECF No. 20 at 6–7. She further maintains that Dr. Alam's opinion is supported by Counselor Partin's notes. *Id.* at 32–33. She notes that as her primary care provider, Dr. Alam was copied on reports from the treating specialists and based his opinion on their findings and restrictions. [ECF No. 20 at 5–6].

The Commissioner argues the ALJ properly cited a lack of objective support and inconsistency with Plaintiff's ADLs in discounting Dr. Alam's opinion. [ECF No. 19 at 12–13]. He maintains the ALJ did not err in noting a lack of objective evidence to support Dr. Alam's opinion, as Dr. Alam did not mention that he had considered Plaintiff's fibromyalgia in forming his

opinion. *Id.* at 13. He contends the ALJ cited as inconsistent with Dr. Alam's opinion Plaintiff's ADLs as documented in a mobility questionnaire and function report, her reports to Dr. Smith that she could tie her shoes and sit to watch a movie, and her reports to Dr. Cannon that she drove, performed self-care activities, made change, prepared meals, watched television, read, attended church, and shopped. *Id.*

The ALJ gave "little weight" to Dr. Alam's opinion, finding it was "not supported by the objective examination findings discussed above or the claimant's reported daily activities." Tr. at 19. The ALJ subsequently wrote the following:

> The claimant's representative argued that more weight should be assigned to the opinions of the claimant's treating sources Leroy Snead, PA-C, at Exhibits 25F and 26F and T.S. Alam, M.D., at Exhibit 15F, wherein these sources (Exhibits and B24E) noted the claimant was less than sedentary. The claimant's allegation of having disabling symptoms and limitations are not supported by the objective diagnostic and examination findings and written documentation of the claimant's daily activities are not consistent with the claimant's testimony. The record further shows that the claimant's treatment history for pain has essentially been routine and conservative in nature, consisting of medications primarily. As discussed above, the opinions of Dr. Alam and Mr. Snead have been considered and given appropriate weight.

Tr. at 20–21.

The ALJ rejected Dr. Alam's opinion as inconsistent with the other evidence of record, but she did not adequately explain her conclusion. The ALJ referenced multiple ADLs that were inconsistent with the level of

impairment Dr. Alam suggested. *See* Tr. at 17 ("The claimant also alleged she had to lie down a lot but she watched television, and on a good day, she could grocery shop with her mother. The claimant further alleged she could walk for 5 minutes without tiring; did not need an assistive device; she could climb 2 steps without stopping to rest; she could sometimes use a pen or pencil, brush her hair, type, reach for things over her head, or lift a gallon of milk; she could use a knife or fork, brush her teeth; but she had difficulty with zippers and buttons; she could use a doorknob and turn faucets but she could not open a job; and she could lift 3 pounds using both hands. The claimant noted she had daily pain for which she had to stay in bed (Exhibit 5E)."); Tr. at 18 ("In a function report also dated April 20, 2015, the claimant noted she could complete personal care; sometimes prepare meals; ride in a car and sometimes drive; shop in stores; manage finances; attend church services; has no problems getting along with others; sometimes completes tasks; tries to pay attention; can follow written instructions on a good day; and can handle changes in routine but not stress (Exhibit B4E)"; "In a June 2015 consultative examination, the claimant reported she was able to tie her shoes and cook as well as climb up and down stairs . . . [s]he was able to sit and watch a movie without difficulty; and walk a block at a normal pace on a good day (Exhibit B8F, page 2")); Tr. at 19 ("The claimant reportedly drove, carried out self-care activities, made change effectively, prepared meals . . .

watched television, read, went to church, and shopped. The claimant was able to carry out social and daily self-care activities in an independent and sustained fashion; maintain concentration and pace sufficiently to complete tasks timely."). Although Plaintiff reported abilities to attend church, prepare meals, drive and ride in a car, and visit the grocery store, she indicated she could only do so on "good days." *See* Tr. at 386–93. The ALJ failed to consider Plaintiff's qualifications as to her ability to perform the ADLs on a regular and sustained basis in evaluating Dr. Alam's opinion. He cited reports primarily from 2015 and did not address evidence suggesting a progressive decline in Plaintiff's functional abilities, including an order for in-home assistance. *See* Tr. at 1079.

The ALJ cited objective evidence that arguably suggested Plaintiff's impairments were not as severe as she alleged. *See* Tr. at 18–20 (noting diagnostic imaging showing only minimal degenerative changes to the cervical spine and an unremarkable lumbar spine; normal ROM of multiple joints; abilities to ambulate to the exam room, get on and off the exam table, and up and out of a chair without much difficulty; no edema; good gross and fine manipulative skills; normal mental status exam; ability to follow simple directions; no significant sensory deficits). However, as discussed above, she ignored some of Dr. Holt's abnormal findings that arguably supported Dr. Alam's opinion. *See* Tr. at 888–99. She also failed to adequately consider Dr.

Alam's impression as to the effects of pain given that Dr. Alam reviewed records from other providers who treated Plaintiff for chronic pain and fibromyalgia. In *Arakas v. Commissioner*, Social Security Administration, 983 F.3d 83, 97 (4th Cir. 2020), the court held "that ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia." In discussing the ALJ's rejection of the plaintiff's treating physician's opinion as to the effects of fibromyalgia on the plaintiff's functional abilities, the court again noted "lack of support from objective medical evidence means very little in fibromyalgia cases." *Id.* at 106. Dr. Alam did not specify that his opinion was based on a fibromyalgia diagnosis, but he recognized that Plaintiff was receiving treatment for chronic pain, Tr. at 864, and treatment notes from his practice indicate symptoms and treatment for fibromyalgia. Tr. at 726, 740, 745. The ALJ erred to the extent that she did not adequately evaluate whether Dr. Alam's opinion was reasonable given Plaintiff's fibromyalgia diagnosis.

In light of the foregoing, substantial evidence does not support the ALJ's rejection of Dr. Alam's opinion.

### c.    PA Snead's Opinion

PA Snead completed a mental medical source statement on October 10, 2018. Tr at 957–59. The statement provides that "'rarely' means 1% to 5% of an 8-hour workday; 'occasionally' means 6% to 33% of an 8-hour workday; 'frequently' means 34% to 66% of an 8-hour workday." Tr. at 957. PA Snead indicated Plaintiff was rarely capable of following work rules, using judgment, and interacting with supervisors. *Id.* He indicated Plaintiff could never relate to coworkers, deal with the public, deal with work stresses, function independently, and maintain attention/concentration. *Id.* He wrote: "Pt. stays in home & in bed 99% of time & has trouble making doctor appts." Tr. at 957, 958. He noted Plaintiff could rarely understand, remember, and carry out simple job instructions and could never understand, remember, and carry out complex job instructions or detailed, but not complex job instructions. Tr. at 958. He felt that Plaintiff could frequently maintain personal appearance; occasionally behave in an emotionally-stable manner; and rarely relate predictably in social situations or demonstrate reliability. *Id.* He indicated Plaintiff's mental impairments would require her to exceed the number of usual breaks during an eight-hour workday and would interfere with the completion of an eight-hour workday. *Id.* He anticipated Plaintiff's impairments or treatment would cause her to be absent from work on more than four days per month. Tr. at 959. He confirmed that Plaintiff's

impairments had lasted or could be expected to last at least 12 months. *Id.*
He denied that Plaintiff was a malingerer. *Id.* He indicated Plaintiff's
impairments were reasonably consistent with the symptoms and functional
limitations described in the evaluation. *Id.* He noted Plaintiff had "severe
anxiety and pain." He wrote: "Tried to get psychiatrist referral but most won't
accept her insurance & she cannot afford. Has seen a counselor. Has been to
orthopedist & neurosurgeon. Could not tolerate Lyrica or Gabapentin." *Id.* He
considered Plaintiff capable of managing benefits in her own best interest. *Id.*

PA Snead completed a second questionnaire on the same day that
addressed Plaintiff's physical impairments. Tr. at 961–64. He explained that
he had treated Plaintiff every four months since January 2016. Tr. at 961. He
identified Plaintiff's diagnoses as PTSD, bipolar disorder, chronic pain,
ADHD, fibromyalgia, degenerative joint disease, DDD, CTS, and COPD. *Id.*
He characterized Plaintiff's prognosis as guarded and fair. *Id.* He noted
Plaintiff's symptoms included anxiety, fatigue, chronic pain, and depression.
*Id.* He described Plaintiff's pain as occurring all over, constant, severe, and
present in her low back, bilateral hips, right shoulder, and left wrist. *Id.* He
explained that Lyrica and Gabapentin had caused swelling, sedation, and
dizziness; Prazosin provided some relief for PTSD; Morphine Sulfate and
Norco reduced pain from level 10 to about a six; and injections had not
helped. *Id.* He confirmed that emotional factors, including depression,

anxiety, bipolar disorder, and PTSD, contributed to the severity of Plaintiff's symptoms and functional limitations. *Id.* He considered Plaintiff's impairments to be reasonably consistent with the symptoms and functional limitations he described. *Id.* He confirmed that Plaintiff would need to shift positions at will from sitting, standing, or walking. Tr. at 962. He indicated Plaintiff would require unscheduled breaks during an eight-hour workday. *Id.* He estimated Plaintiff could rarely lift less than 10 pounds and could never lift 10 pounds or more. *Id.* He indicated Plaintiff could never sustain flexion of her neck, turn her head right or left, look up, hold her head in a static position, twist, stoop (bend), crouch/squat, climb ladders, or climb stairs. *Id.* He felt that Plaintiff's experience of pain or other symptoms was constantly severe enough to interfere with attention and concentration needed to perform even simple work tasks. Tr. at 963. He considered Plaintiff incapable of performing even low-stress jobs due to PTSD and bipolar disorder. *Id.* He indicated Plaintiff could walk zero city blocks, sit for 15 minutes at a time, stand for 15 minutes at a time, sit for less than two hours in an eight-hour workday, and stand for less than two hours in an eight-hour workday. *Id.* He thought Plaintiff would need to include periods of walking around. *Id.* He noted Plaintiff had significant limitations with reaching, handling, or fingering that restricted her to grasping, turning, and twisting objects from one to five percent of an eight-hour workday; fine manipulation

from one to five percent of an eight-hour workday; and reaching for one to five percent of a workday. Tr. at 964.

Plaintiff argues the ALJ did not provide a sufficient reason for rejecting PA Snead's opinion. [ECF No. 18 at 30]. She maintains that as her primary care provider, PA Snead was aware of how emotional factors contributed to her symptoms and functional limitations. *Id.* at 30–31. She contends the ALJ was permitted to give less credit to PA Snead's opinion because he was not a mental health provider, but erred in rejecting the opinion for that reason alone. *Id.* at 31. She claims PA Snead's opinion is also supported by Counselor Partin's notes and is consistent with the other evidence of record. *Id.* at 32–33; ECF No. 20 at 9.

The Commissioner argues the ALJ did not discount PA Snead's opinion merely because he did not treat Plaintiff's mental impairments. [ECF No. 19 at 14]. He maintains the ALJ also rejected PA Snead's opinion because it was not supported by objective findings and was inconsistent with Plaintiff's ADLs. *Id.* He further contends PA Snead's opinion is not entitled to controlling weight as a medical opinion from a treating physician because a physician assistant is not an acceptable medical source pursuant to the applicable regulations. *Id.*

The ALJ addressed PA Snead's opinion in combination with Dr. Alam's opinion, as discussed above. However, she also addressed PA Snead's opinions independently as follows:

> In October 2018, physician assistant L. Snead, PA-C, opined the claimant could either rarely or never make most mental work-related job adjustments, as the claimant stayed in home in bed 99% of the time and reportedly had difficulty making doctor appointments (Exhibit B25F). L. Snead also assessed physical work related limitations (B26F). The undersigned gave these opinions little weight as L. Snead does not treat the claimant's mental impairments.

Tr. at 20.

Although PA Snead was not an acceptable medical source, the ALJ should have considered the relevant factors in 20 C.F.R. § 404.1527(c) and § 416.927(c) in evaluating his opinion. *See* SSR 06-3p, 2006 WL 2329939 at *4 (2006). Instead of considering those factors, the ALJ gave PA Snead's opinion as to physical and mental limitations "little weight" because PA Snead did not treat Plaintiff's mental impairments. *See* Tr. at 20.

The ALJ's explanation is flawed for multiple reasons. The ALJ did not address the treatment relationship between Plaintiff and PA Snead, which is important to the analysis as PA Snead treated Plaintiff every four months over a three-year period. *See* Tr. at 961; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ also failed to address whether the physical or mental limitations PA Snead indicated were supported by his exam findings. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). Although PA Snead was not a

psychologist or psychiatrist, he prescribed and adjusted the medications to treat Plaintiff's mental impairments. *See id.*; *see also* Tr. at 698, 699, 700, 712, 718, 734, 1078, 1079. Finally, the ALJ failed to evaluate whether PA Snead's opinion was consistent with the other evidence of record. As Plaintiff notes, PA Snead's impressions as to Plaintiff's mental limitations are arguably consistent with Dr. Holt's and Alam's and Counselor Partin's impressions. *See* Tr. at 864, 865, 866, 897, 898.

Because the ALJ did not conduct the proper assessment, substantial evidence does not support her allocation of little weight to PA Snead's opinion.

## III.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

February 18, 2021
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge